UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

vs.                                                         CRIMINAL NO. 3:13-CR-127 (HBF)

KRYSTOPHER DIBELLA
        Defendant.                                    SEPTEMBER 25, 2013

---

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

On June 24, 2013, Krystofer DiBella entered a guilty plea to a single count charge of Failure to Make a Proper Entry on Form 4473, as described in 18 USC §§ 2, 922(m) and 924(a)(3)(B), pursuant to the Plea Agreement entered in this case. In executing the plea agreement and stipulation and entering his plea of guilty, Mr. DiBella has promptly accepted responsibility for his conduct.

Mr. DiBella is scheduled to be sentenced on September 30, 2013. He comes before this Court with with remorse and a determination not to let this happen again and understands the gravity of his conduct and the consequences that flow from it. He submits this Memorandum respectfully, to urge the Court, in the exercise of its duty to fashion a sentence tailored to be sufficient but not greater than necessary to serve the purposes of a sentence as set forth in 18 USC § 3553 (a), to accept the sentence in the Plea Agreement.

### DISCUSSION

    I. Krystofer DiBella was twenty-one years of age when, on or about March 15, 2010, he committed the single offense of *failure to make proper entry on a form 4473*, as described in 18 USC Section 2, 922(m) and 924(a)(3)(B). The facts set forth in Sec. 1, 2

and 3 of the PSR accurately set forth the procedural history of this case. Mr. DiBella has since his release on Bond complied with all terms and conditions of his Release. (PSR ¶ 4).

II. The charge to which the Defendant has pled relates to the completion of a Federal Form 4473 incidental to the sale of a firearm to a Mr. MacWaughla Peak on March 15, 2010. (See PSR ¶ 11) The Government contents that Mr. Peak was not a Resident Alien lawfully residing in the United States and as such was not eligible to purchase a firearm. This allegation is not consistent with the information contained on the form 4473 as supplied by the Government. *See copy attached as Exhibit A*. Block 20a on the form 4473 shows that the Purchaser was issued a Connecticut Carry Pistol Permit 5 days prior to the sale (5 years prior to the expiration date). As a non-resident alien cannot qualify for a Connecticut Pistol Permit, it is improbable that the Purchaser was a non-resident Alien as alleged by the Government. Attached is a copy of the requirements for a Connecticut Pistol Permit, per the official Connecticut State Police Form DPS 769-C *copy attached as Exhibit B* . As clearly set forth, every applicant for a Carry Pistol Permit must provide a Passport, Birth Certificate or Green Card along with proof of residency to qualify for the license. These checks are then verified by fingerprints submitted to the FBI. Connecticut has an additional cross check on the system, which requires that prior to a sale the dealer must do the Federal NICS (background) check, which includes that the State Police verify whether the license is valid. Mr. Peak's CT Pistol Permit License Number is shown in Block 20a of the 4473 and his NICS authorization to purchase the firearm is set forth in Block 21a of the 4473. To the extent that the Government alleges that the Purchaser was not lawfully able to purchase a firearm they are either in error, or

an incredibly improbable series of errors was made by the City of Hartford who issued the Temporary License, the FBI who examined the fingerprints and the State of Connecticut who would verify the information before issuing the State Permit to Carry and then do the NICS check prior to sale. Perhaps it happened, but to suggest that a sales clerk should expect that a person was not lawfully able to purchase when they have a verified permit is not credible. What the Defendant does not dispute is that he was required to check whether Mr. Peak had written down his "Green Card" ID number in Block 15. It was not his duty to write it in, but he should have caught that a Block was blank. He did not, and he accepts that he made a mistake. But that mistake was inadvertent; there was never any intention to commit a crime.

III. The Government has referenced the tragedy in Sandy Hook. (PSR ¶ 6) What happened in Sandy Hook is heart wrenching, but there is nothing relevant to Mr. DiBella who bears no fault for the tragedy. He did not create the laws which allowed the gun to be sold, and any involvement by him is undisputed to have been lawful. Similarly in Sec. 6, events in December of 2012, i.e. during time periods when Mr. DiBella was not even employed by the store.

IV. The Government references Mr. DiBella admitting to ATF that he sold ammunition to a Felon and also allowed the felon to handle a firearm. (PSR ¶ 9) This incident relates to a common slippery slope where a husband and wife live together and one of them has a prior felony. The wife had a pistol permit and shot with Mr. DiBella at their local range. She often came into the store to buy ammunition. If the Husband was present with his wife, is it a constructive sale to a felon? If a husband says,"Here dear" and hands his wife $20, is that anything out of the ordinary in a married couple's normal relations? And, if

her husband touches a gun while his wife is looking at it, is that a felon in possession? Perhaps, but nothing about the transaction has any ill motive. These are not crime guns or ammunition. It is at worst a technical breach, without any criminal motive.

V. The allegations in PSR¶ 10 are also highly technical. Mr. DiBella's employer advised him as to what they needed to do to lawfully sell certain firearms to Out of State Citizens i.e. refer them to a FFL in their home state. As a general rule that would be correct. Tite Group was apparently a duly licensed Federal Firearms Dealer in Massachusetts. Whether this was right or wrong, Mr. DiBella believed Mr. LaGuercia (his employer) when he was told that this is what he needed to do to comply with the law. Mr. DiBella is not charged with any offense related to these transactions, which were solely the policy if his Employer. The problem relates to Massachusetts laws, of which Mr. DiBella was not required to know and of which he knew nothing.

VI. <u>Mr. DiBella History of Service to the State.</u> As set forth in PSR ¶ 28-33 Mr. DiBella did not have an easy youth. His mother died while he was in his early teens, his older brother had moved out of the house years earlier and his father a retired Police Officer and Fire Fighter became increasingly alcoholic. A person of lesser character could easily have become involved with drugs or alcohol, or dropped out of school. Krys did neither and in fact worked through high school helping to tutor other students who were struggling with their studies. Upon graduation, he then applied for and joined the Goshen Fire Department as a volunteer firemen. This included attending and graduating from Fire School. He served actively in the Department, including having served as a Fireman to rescue people from rising waters during Superstorm Sandy. Krys hopes to one day obtain a position as a paid firemen and has continued to serve, now through the Suffield Fire

Department. His move between Departments relates to his opening a business and moving his residence. The Department was fully advised of this case, reviewed all of the facts and based on the totality of the circumstances accepted Krys as a Volunteer Fireman with their department.

VII. Mr. DiBella was not paid by commission. He had no financial motive. To the extent that he made paperwork mistakes, and he did make a few over the course of a large number of transactions, these mistakes are inadvertent. He had no financial motive for anything that he did, nor any intent to break any law.

VIII. Mr. DiBella is gainfully employed in the Sporting Industry. He has built a small business and while it only generates enough money for him to take home a few hundred dollars a week, it is enough for him to live on and he has run the business in strict compliance with all laws. Having never been convicted of any prior offense, Mr. DiBella has no criminal history. Given Mr. DiBella's age, his employment history, and his absence of criminal history, a sentence that allows him to continue to work would be "sufficient, but not greater than necessary," to comply with the goals of sentencing. 18 U.S.C. § 3553(a).

IX. The circumstance that most readily sets Mr. DiBella's situation apart from many others is that from an early age he has consistently tried to help others, whether it was his disabled father, other students or serving his community as a Fireman. In working for Riverview perhaps his desire to be helpful was his downfall. He has learned from the experience, but unlike so many cases which arise form addiction, greed or malice, Krys has always tried to do the right thing, even if he did not always succeed. Mr. DiBella's employment history and youthful age are included in his "history and characteristics," part of the

statutorily required consideration in the sentencing determination. 18 U.S.C. § 3553(a)(1). Similarly, his reason for committing the offense is part of "the nature and circumstances of the offense," the other part of the statutorily required consideration. *Id.* Additionally lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines. See United States Sentencing Commission, Guidelines Manual 5H1.1-6, 11, and 12 (Nov. 2006).n3. These are, however, matters that § 3553(a) authorizes the sentencing judge to consider. *See, e.g.,* 18 U.S.C. § 3553(a)(1).

Rita v. United States, 551 U.S. 338, 364-365 (2007) (Stevens, J. concurring). *See also* United States v. Jarvi, 537 F.3d 1256, 1263 (10th Cir. 2008) ("We have now held that district courts have broad discretion to consider individual characteristics like age, employment, and criminal history in fashioning an appropriate sentence under 18 U.S.C. § 3553(a), even when disfavored under the Guidelines or already accounted for in another part of the calculation").

In Gall v. United States, 552 U.S. 38 (2007), the court relied on the youth of the twenty-one year old defendant as one of the reasons justifying a below-guideline sentence:

> In summary, the District Judge observed that all of Gall's criminal history "including the present offense, occurred when he was twenty-one-years old or younger" and appeared "to stem from his addictions to drugs and alcohol." *Id.*, at 122-123. The District Judge appended a long footnote to his discussion of Gall's immaturity. The footnote includes an excerpt from our opinion in Roper v. Simmons, 543 U.S. 551, 569, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), which quotes a study stating that a lack of maturity and an undeveloped sense of responsibility are qualities that "'often result in impetuous and ill-considered actions.'" The District Judge clearly stated the relevance of these studies in the opening and closing sentences of the footnote: "Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five. . . . [T]he recent [National Institutes of Health] report confirms that there is no bold line demarcating at what

age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant." App. 123, n 2.

*Id.* at 57-58.

Similarly, the courts have recognized that employment history is a valid justification for a below-guideline sentence. *See*, Kimbrough v. United States, 552 U.S. 85, 110 (2007) ("second, the [district] court considered Kimbrough's 'history and characteristics.' § 3553(a)1) . . . [noting] that Kimbrough has no prior felony convictions, that he had served in combat during Operation Desert Storm and received an honorable discharge from the Marine Corps and that he had a *steady history of employment* ")(emphasis added); United States v. Sota, 2010 U.S. Dist. LEXIS 53118, *14-15 (E.D. Wis. April 30, 2010); United States v. Garza, 2008 U.S. Dist. LEXIS 100400, *8 (N.D. Ill. December 4, 2008).

This Court is well aware of the goals of sentencing set forth in 18 U.S.C. § 3553(2)-(7). Mr. DiBella's work history, his lack of criminal history, his age, the circumstance that his crime was largely the product of his immaturity, and that as a young man, he has a greater capacity for change, suggests a reduced possibility of recidivism and are relevant to the need to promote respect for the law.[1] Indeed, as recognized by the Sentencing Commission, across all criminal history categories, "those with stable employment in the year prior to the instant offense are less likely to recidivate (19.6%) than those who are unemployed (32.4%)." [2] The Sentencing

---

[1] Just, however, as a sentence that is too short may fail to reflect the seriousness of the offense, promote respect for the law, or provide just punishment, so will a sentence that is excessively harsh. *See, e.g.*, United States v. Ontiveros, 07-CR-333, 2008 U.S. Dist. LEXIS 58774, *6 (E.D. Wis. July 24, 2008) ("[A] sentence that is disproportionately long in relation to the offense is unjust and likewise fails to promote respect [for the law]"); United States v. Zavala, No. 07-14851, 2008 U.S. App. LEXIS 24168, *8-9 (11th Cir. Nov. 25, 2008) ("[A]ny higher sentence would promote disrespect for the law.") (quoting the district court).

[2] United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines (May 2004)*, at 12. Available at:

Commission has determined, too, that those who, like Mr. DiBella, are not only first offenders under the Guidelines, but who also have no prior arrests, are the least likely to commit further offenses.[3] They have the lowest recidivism rate, 6.8%, and are described in the Commission's report as "easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend."[4]

Mr.DiBella's calculated guideline range allows for a sentence of no time to serve up to six months of imprisonment and a fine of up to $100,000 (PSR ¶16). While such a sentence would allow Mr. DiBella to continue working, a lesser sentence of probation would be "sufficient, but not greater than necessary," to comply with the goals of sentencing. 18 U.S.C. § 3553(a).

For all these reasons, Mr. DiBella respectfully requests this Court to impose a sentence of 3 yrs probation subject to the condition that he shall not apply for a Federal Firearms License during the term of Probation. Mr. DiBella would ask that the Court impose no fine other than the

---

www.ussc.gov/publicat/Recidivism_General.pdf.

[3]United States Sentencing Commission, *Recidivism and the "First Offender" (May 2004)*, at 17. Available at www.ussc.gov/publicat/Recidivism_FirstOffender.pdf . The Committee notes that there are two other groups that, under the Guidelines, are technically first offenders, those who have arrests and no convictions and those who have convictions which, for one reason or another, are not counted. Both have higher recidivism rates than those who have never been arrested.

[4]*Id.*

statutory $25 as he owns no real estate and his net worth is less than $5,000.00.

Respectfully Submitted,

By: *[signature]*

Lawrence D. Church , Esq.
Pirro & Church, LLC
50 Washington St
Norwalk, CT 06854
Tel 203.853.4999
No. ct00125
lawrence.church@pirrochurch.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to Robert Spector, Assistant United States Attorney, by electronic delivery this 25th day of September, 2013

Respectfully Submitted,

By: *[signature]*

Lawrence D. Church , Esq.
Pirro & Church, LLC
50 Washington St
Norwalk, CT 06854
Tel 203.853.4999
No. ct00125
lawrence.church@pirrochurch.com
